UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                                  :

RICHARD KATZMAN,                                 :

                                    :            12 Civ. 4220 (PAE)

                         Plaintiff,     :

                                    :            OPINION & ORDER

               -v-                      :

                                    :

HELEN OF TROY TEXAS CORPORATION and    :
HELEN OF TROY LIMITED,                  :

                                    :

                       Defendants.   :

                                    :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       This case involves a dispute over money residing in an escrow fund created in connection with a corporate acquisition. At the time that Kaz, Inc. ("Kaz") was acquired by defendants Helen of Troy Corporation and Helen of Troy Limited (collectively, "Helen of Troy" or "HoT"), $17.7 million of the purchase price was set aside in an escrow account, to cover, *inter alia*, any latent tax liabilities of Kaz. Under its agreements with Kaz, HoT was required, as of May 15, 2012, to consent to release to Kaz's selling shareholders the funds in the escrow account, unless certain circumstances (identified in the agreements) existed that justified retention of those funds. In this diversity action, plaintiff Richard Katzman, who represents the selling shareholders, claims that HoT has wrongly refused to release approximately $11.7 million from the escrow fund. Katzman brings claims for breach of contract and for a declaratory judgment. HoT disputes liability.

       Katzman now moves for summary judgment. For the reasons that follow, that motion is granted in part and denied in part.

Separately, HoT moves for reconsideration of the Court's decision of August 28, 2012, which denied HoT leave to add counterclaims relating not to the release or retention of the escrow funds, but to various claims for indemnification that HoT contends are ripe for resolution. Dkt. 24. For the reasons that follow, including that these claims are not yet ripe, that motion is denied, without prejudice to HoT's right in the future to bring a timely lawsuit raising such claims.

## I.    Background[1]

### A.  Helen of Troy's Acquisition of Kaz

Helen of Troy Corp., a Texas corporation, is a wholly-owned subsidiary of Helen of Troy Ltd., a Bermuda corporation. Kayman Decl. Ex. 1, at 1; Taylor Decl. Ex. 1 ("Grass Dep."), at 7. HoT produces and sells, to a national market, personal care products, housewares, and healthcare and home environment products. Its products include the brands OXO, Pert Plus, and PUR. Taylor Decl. Ex 1 ("HoT 10-K"), at 4, 6. Kaz, the company that HoT acquired, is a New York corporation. Kaz manufactures and sells healthcare products and small home appliances. Its products include the brands Braun, Vicks, and Honeywell. *Id.*

In December 2010, a group of Kaz shareholders sold their equity interests in Kaz to HoT for $271.5 million. Pl. 56.1 ¶ 1; Def. 56.1 ¶ 1. For simplicity's sake, the Court uses "Katzman" to refer both to Richard Katzman and to the selling shareholders whom he represents.

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motions—specifically, the Declaration of Steven M. Kayman ("Kayman Decl.") (Dkt. 28) and attached exhibits; the Declaration of Mark D. Taylor ("Taylor Decl.") (Dkt. 52) and attached exhibits; Plaintiff's Local Rule 56.1 Statement of Material Fact ("Pl. 56.1") (Dkt. 27); and Defendant's Local Rule 56.1 Statement of Material Fact ("Def. 56.1") (Dkt. 51). Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.

###### B.  The Merger and Escrow Agreements

Two documents executed in connection with that sale are central to this dispute, which involves the proper disposition of funds set aside in an escrow fund created at the time of HoT's acquisition of Kaz.  These are (1) the Agreement and Plan of Merger, Kayman Decl. Ex. 1 ("Merger Agreement," "Agreement," or "MA"), and (2) the Escrow Agreement, Compl. Ex. B ("Escrow Agreement" or "EA").  The parties agree that both are valid and binding contracts.  Pl. 56.1 ¶ 2; Def. 56.1 ¶ 2.

In the Merger Agreement, the selling shareholders made various representations to HoT regarding Kaz's financial condition, outstanding lawsuits, employee benefit plans, and other subjects.  The representations relevant here involved Kaz's taxes.  In Article IV of the Merger Agreement, Katzman represented, *inter alia*, that Kaz and its subsidiaries had timely filed all required tax returns, MA § 4.8(a)(i); paid all taxes due and owing as of the date of the Merger Agreement, *id.* § 4.8(a)(ii); and delivered to HoT all of their tax returns for the preceding three years, *id.* § 4.8(a)(iii).  Katzman also represented that neither the IRS nor any other tax authority had asserted, was asserting, or was "proposing in writing to assert against [Kaz] or its subsidiaries any deficiency or claim for any amount of additional Taxes," *id.* § 4.8(a)(iv); that "no federal, state, local or foreign Tax Proceedings are pending or being conducted," *id.* § 4.8(a)(v); that Kaz had not received written notices of actual or threatened Tax Proceedings or written requests for information related to Tax Matters, *id.*; and that "all Taxes and other assessments and levies which [Kaz] and its Subsidiaries were required to withhold or collect have been withheld or collected and have been paid over to the proper Governmental Authorities," *id.* § 4.8(a)(vi).  The Agreement provides that the selling shareholders' tax

representations survive post-closing and continue until the statutes of limitations for the taxable periods covered by the representations expire. *See id.* § 10.1(b).[2]

The Merger Agreement also contained a series of indemnification provisions. Relevant here, the selling shareholders agreed to hold HoT harmless, and indemnify it, "to the extent of any Loss resulting from (i) the breach of any warranty of the Company contained in Article IV," *id.* § 10.2, including the tax-related representations summarized above. The Agreement defines "Losses" as "any and all losses, liabilities, damages, claims, awards, judgments, costs and expenses (including reasonable attorneys' fees) actually suffered or incurred by such Person"; it excepts "punitive damages or any multiple of damages or diminution in value." *Id.* § 12.5(ff). The Agreement further provides that "the amount of any Loss subject to indemnification under § 10.2" shall be calculated net of insurance proceeds received by HoT or indemnification payments received by HoT from a third party. *Id.* § 10.2(f).

The Merger Agreement further provides that HoT is required to give Katzman "written notice of any claim, assertion, event or proceeding as to which [HoT] may request indemnification herein under as soon as practicable after the time that [HoT] first learns of such claim, assertion, event or proceeding"; it specifies the information required to be contained in such notice. *Id.* § 10.2(g). With respect to any third-party claim for which indemnification is sought, HoT "shall have the right to direct, through counsel selected by it and subject to the reasonable approval of [Katzman], the defense of any such Proceeding at the [selling shareholders'] expense, such expense to be paid out of the Indemnity Escrow Fund [the Escrow Fund]." *Id.* § 10.2(h). If HoT "assumes the defense of a third party claim, [HoT] shall not have

_____

[2] Excepted from Katzman's representations were items specifically disclosed on an appended schedule or items that would not have a material adverse effect. Neither of those exceptions is relevant to the pending motions.

the right to settle such claim without the prior written consent of [Katzman], which consent shall not be unreasonably withheld." *Id.* If, however, HoT fails or chooses not to defend against such a claim, Katzman "shall have the right to undertake the defense or settlement thereof," although HoT retains the right to participate in the settlement, or assume or reassume the defense, of such a proceeding, at its own expense. *Id.* If HoT assumes the defense of a third-party claim, "any and all Losses paid in connection with such a claim shall be borne solely out of the Escrow Fund." *Id.*

As for the Escrow Agreement, it sets out the parties' agreements regarding the Escrow Fund.[3] As pertinent here, that agreement requires HoT to deposit, out of the proceeds owed to the selling shareholders, $17.7 million in cash, with the escrow agent, J.P. Morgan Chase Bank, N.A. EA at 1. This money is "to be used for payment of certain contingencies," including those identified "in . . . Article X of the Merger Agreement," *id.*, which contains the indemnification provisions.

The Escrow Agreement sets a deadline of May 15, 2012, approximately 17 months after the closing of the acquisition, for HoT to give notice (an "Indemnity Demand Notice") to Katzman and the escrow agent "setting forth the aggregate amount ('the Indemnity Claim Amount') of the Losses claimed by [HoT]," pursuant to § 10.2(g) of the Merger Agreement. EA § 4(d)(iii). To the extent HoT does not give such notice, the escrow fund must be disbursed to Katzman. *Id.* § 4(d)(ii). To the extent, however, that HoT provides such notice, the escrow agent is required, 31 days later, to release and pay to HoT the amount it sought, unless Katzman has by that time furnished written notice (an "Indemnity Objection Notice") to the escrow agent and to HoT objecting to such release and payment to HoT. *Id.* § 4(d)(iii). With respect to funds

---

[3] The Escrow Agreement also provides for a separate escrow fund, the $2.3 million "Working Capital Escrow Fund." That fund is not relevant to this dispute.

whose release is disputed in this fashion by Katzman and HoT, the escrow agent may release the funds only upon a court order or joint written instructions from Katzman and HoT. *Id.* § 4(d)(iv).

The Merger Agreement addresses the circumstance in which HoT, after May 15, 2012, asserts a breach of the selling shareholders' tax representations. HoT may pursue those claims by bringing actions against the selling shareholders. *See* MA § 10.2(d) (selling shareholders "shall, severally but not jointly, indemnify and hold harmless [HoT] to the extent of any Loss resulting from the breach of any Tax Representations"; "an indemnifiable Loss shall only be a Loss relating to a pre-Closing Period"). With respect to claims made after that date, there is no provision in either agreement for HoT to seek recourse from the Escrow Fund.

### C.  HoT's Indemnification Demand Notice

On May 14, 2012, the day before the deadline for making claims upon the escrow fund, HoT submitted an Indemnity Demand Notice to the escrow agent and Katzman. Kayman Decl. Ex. 2 (the "Notice"). HoT asserted that it was entitled to $11,692,876 from the escrow fund, based on asserted breaches of Katzman's tax representations. *Id.*; Pl. 56.1 ¶ 4; Def. 56.1 ¶ 4. HoT did not assert claims with respect to the balance of the escrow fund, which was released to the selling shareholders.

HoT's Notice consisted of 18 claims. HoT's claims for indemnification are usefully grouped into six categories:

(1) **The IRS Claims**:  Four claims involved adjustments to Kaz's tax returns that have been proposed by the United States Internal Revenue Service ("IRS"). Claim One, for $347,872, arises from a Notice of Proposed Adjustment ("NOPA") from the IRS for the 2007 tax year. Claim Two, for $870,321, arises from a NOPA from the IRS for the 2008 tax year. Claim Five,

for $275,122, is the subject of a NOPA from the IRS for the 2007 tax year. And Claim Six, for

$311,496, is the subject of a NOPA from the IRS for the 2008 tax year. *See* Notice 1–2. The

adjustments sought by the IRS are not yet final, because HoT has filed appeals with the IRS,

which are pending. Def. 56.1 ¶¶ 8–9; Pl. 56.1 ¶¶ 8–9; Kayman Decl. Ex. 3, at 11.

(2) **The Hong Kong Inland Revenue Claim:** Claim Ten, for $269,859, reflects an

adjustment to Kaz's tax returns proposed by the Hong Kong Inland Revenue to Kaz (Far East)

Limited's income for the periods 2005–2006 and 2010–2011. *See* Notice 2. This adjustment is

also not final, because HoT is appealing it. On May 31, 2012, following the May 15, 2012

deadline for HoT to give notice as to claims against the escrow funds, HoT purchased tax reserve

certificates for this claim, which are refundable if the protest is successful. Def. 56.1 ¶¶ 11–13,

61; Pl. 56.1 ¶¶ 11–13.

(3) **The Anticipated IRS Claims**: Two claims involve adjustments which HoT

anticipates the IRS will make to its tax returns, but, as of May 15, 2012, the IRS had not made or

otherwise taken action on. Claim Three, for $872,216, reflects an estimated income tax

adjustment for the 2009 tax year, based on facts for that year that HoT claims substantially

parallel those that form the basis of the NOPAs in Claims One (2007) and Two (2008). Claim

Four, for $360,432, similarly reflects an estimated income tax adjustment for the 2010 tax year.

*See* Notice 1. On the basis of these anticipated claims, HoT has internally determined that

accruals for these tax years were necessary. Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.

(4) **The AMT Claim**: Claim Nine, for $228,943, is based on HoT's calculation that an

alternative minimum tax ("AMT") credit taken by Kaz for the 2006 tax year is in fact of lesser

value than Kaz had declared at the time of the merger. *See* Notice 2. More specifically, HoT

claims that as a result of a post-merger settlement that the selling shareholders came to with the

7

IRS, the related AMT tax credit, which HoT purchased as part of the merger, decreased in value. Def. 56.1 ¶¶ 14–16, 52.

(5) **The Accrual Claims**:  Nine claims are in the form of bookkeeping accruals by HoT and were not subject to any current action or claims by any tax authority.  Claim Eight is not for a specified amount, but is "the potential claim that Kaz (Far East) Limited was required to file a U.S. Tax Return."  Notice 2.  Claims Eleven through Eighteen each represent an accrual based on an assessment by HoT that Kaz had underreported taxable income from foreign subsidiaries and affiliates.  *Id.*; Def. 56.1 ¶¶ 64–101.  These eight claims total $8,129,744.  Katzman disputes whether these accruals were merited, and notes that HoT, as a public company acquirer, has an incentive to take such accruals, and potentially to reverse them into income at a later date.  *See* Pl. Br. 13–14.  However, for the purposes of this motion, the Court assumes *arguendo* that HoT undertook these accruals in good faith and on a defensible basis.

(6) **The New York State Claim**:  Claim Seven, for $37,771.60, arises from a proposed audit change from the New York State Department of Taxation and Finance for the period of March 1, 2008, through November 30, 2010.  *See* Notice 1.  HoT has already settled this claim and—unlike the other claims—has paid that amount to New York State.  Pl. 56.1 ¶ 17; Def. 56.1 ¶ 17.

### D.  Katzman's Complaint

After HoT submitted its Notice with these 18 claims, the escrow agent released the unclaimed funds from the escrow account, but retained an amount equal to the aggregate value of HoT's claims.  A total of approximately $11.7 million remains in the escrow fund.  Pl. 56.1 ¶ 5; Def. 56.1 ¶ 5.

On May 29, 2012, Katzman filed the Complaint in this case.[4]  Dkt. 1.  It contains three claims:  a breach of contract claim against Helen of Troy Texas Corporation; a breach of contract claim against Helen of Troy Limited; and a declaratory judgment claim against both defendants. Katzman asserts that HoT was not entitled to indemnification, nor to demand that the funds remain in escrow.  In the breach of contract claims, Katzman alleges that HoT breached the Merger Agreement when it failed to direct the escrow agent to release the Escrow Funds to the selling shareholders.  In the declaratory judgment claim, Katzman seeks a declaration to the same effect.  *See* Compl. ¶¶ 29–44.

The Court directed that expedited discovery be taken on Katzman's claims, limited to evidence bearing on the information known to HoT, as of May 15, 2012, justifying its claims upon the escrow agent seeking to block the release to Katzman of escrow funds corresponding to HoT's 18 claims.  HoT sought permission to take extensive discovery of Kaz.  It proposed to try to establish through such discovery that tax authorities might have viable claims to bring against Kaz with respect to its tax filings and payments, so as to support an eventual claim for indemnification.  The Court, however, denied this request.  The Court emphasized that Katzman's lawsuit was limited to the issue of whether HoT, based on information known to it on May 15, 2012, had been justified in resisting release to Katzman of escrow funds corresponding to its 18 claims.  HoT's ultimate entitlement to indemnification as to such claims, which tax authorities might or might not ever bring, was not within the scope of the lawsuit.  Dkt. 24.

---

[4] The record does not reflect any communication between the parties between May 14, 2012, when HoT filed its Notice, and May 29, 2012, when Katzman filed the Complaint.

On August 30, 2012, Katzman moved for summary judgment with respect to 17 of HoT's 18 claims.[5]  Dkt. 25–29.  On September 26, 2012, HoT filed an opposition brief.  Dkt. 50–53.  On October 2, 2012, Katzman filed his reply.  Dkt. 48–49.  On October 10, 2012, HoT filed a sur-reply.  Dkt. 54–55.  On November 13, 2012, the Court heard argument.  Dkt. 61.

**E.  HoT's Attempted Counterclaims**

Also before the Court is a motion by HoT with respect to potential counterclaims.  On July 25, 2012, after the Court had precluded HoT from undertaking discovery of Kaz's records to try to establish a basis for claiming a right to indemnification as to its 18 claims, HoT brought counterclaims.  It sought (1) indemnification under the Merger Agreement; and (2) a declaratory judgment that it was entitled to indemnification, with respect to the 18 claims listed in the Indemnity Demand Notice.  *See* Dkt. 20.

On August 28, 2012, the Court issued an Opinion and Order dismissing HoT's counterclaims.  The Court emphasized that HoT's counterclaims, based largely on its speculative claim that tax authorities will one day challenge Kaz's pre-merger tax filings, dealt with ultimate entitlement to indemnification, whereas Katzman's claims dealt with the much narrower issue of whether funds were required to remain in escrow pending the resolution of disputed claims to indemnification.  Dkt. 24.  The Court explained that HoT's counterclaims for indemnification were not yet ripe, and were not compulsory counterclaims within the meaning of Federal Rule of Civil Procedure 13.  Further, addressing HoT's counterclaims would substantially expand the facts and legal questions at issue; and ruling on as-yet unasserted claims that United States and

---

[5] Katzman does not seek summary judgment on HoT's claim of entitlement to indemnification as to the New York State Claim, based on HoT's payment to New York State tax authorities of $37,771.60.  Although Katzman contends that HoT failed to provide notice and otherwise comply with the Agreement, he concedes that that sum can remain in the escrow fund for now, because factual issues are implicated.  Pl. Br. 1 n.1.  Thus, for the purposes of this motion, it is undisputed that $37,771.60 will remain in the escrow fund.

foreign tax authorities might, or might not, one day bring would necessarily be a conjectural exercise.  Further, because neither loss nor liability had been established on many or all of HoT's indemnity claims, it was premature for the Court to resolve the question of indemnification.  *Id.* at 5–6.  The Court dismissed HoT's counterclaims without prejudice to HoT's ability to bring such a lawsuit later.  *Id.* at 8.

On September 11, 2012, HoT moved for reconsideration of the dismissal of its counterclaims.  Dkt. 34–35.  HoT contends that its counterclaims were compulsory and that it is ripe to consider whether HoT is entitled to indemnification on those claims.  Katzman has opposed HoT's motion for reconsideration.  Dkt. 45.

Because the parties' respective motions are related, this Opinion and Order addresses both Katzman's motion for summary judgment and HoT's motion for reconsideration.

## II.    Katzman's Motion for Summary Judgment

### A.   Legal Standards Applicable on a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory

allegations or denials cannot by themselves create a genuine issue of material fact where none

would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Only disputes over "facts that might affect the outcome of the suit under the governing law" will

preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248

(1986).

### B.   Discussion

#### 1.   Construction of the Parties' Agreements

Katzman's motion for summary judgment largely turns on the construction of the parties'

Merger Agreement and Escrow Agreement as to a single issue:  What standard must be met to

justify the retention of escrow funds after May 15, 2012?  Katzman and HoT take radically

divergent positions as to that construction.

Katzman argues that, under those agreements, all funds were required to be released from

escrow and distributed to the selling shareholders, except to the extent that, as of May 15, 2012,

HoT had an established right to indemnification.  Katzman further argues that, under the Merger

Agreement, HoT has no right to indemnification unless HoT has experienced a "loss," *i.e.*, that it

has actually relinquished money to a tax authority.  Because none of HoT's contested 17 claims

involves such a loss, Katzman argues, none justifies the retention of escrow funds, and the

corresponding escrow funds must be disbursed to the selling shareholders.

HoT, for its part, also contends that the standard for retaining escrow funds after May 15,

2012, is the same as for ultimate indemnification.  But, HoT contends, under that standard, it is

indemnified in all cases involving "liability."  And "liability," in HoT's view, extends broadly to

all instances in which HoT or its accountants have unilaterally determined that a Kaz tax filing

was deficient and that HoT faces tax liability, even where there has been no action whatsoever

taken by any tax authority.  On the basis of this construction, HoT asserts that all 17 of its challenged claims merit the retention (indeed, they require the distribution to HoT) of escrow funds.

Having considered the agreements carefully, the Court's judgment is that neither party's interpretation is persuasive or sustainable.  Katzman and HoT have each staked out an extreme construction of the contractual standard for indemnification.  Each party's construction serves to justify its contention in this litigation that its position is correct as to all 18 of HoT's claims of tax liabilities deriving from Kaz's business, despite the varied nature of those claims.  Each party resists the suggestion that the agreements support any middle-ground interpretation, under which the standard for retention of escrow funds might differ from that for ultimate indemnification.

In fact, as explained below, the agreements, read together and in accord with common understandings of the function of an escrow fund, are inconsistent both with (1) Katzman's notion that escrow funds must be released unless HoT has suffered actual loss of money *and* (2) HoT's notion that escrow funds must be retained based solely on HoT's assertion that it will one day face tax liability based on perceived tax-related lapses by Kaz.  The agreements instead are best read to set out a standard for retention of escrow funds distinct from that for ultimate indemnification.  In sum, they authorize the retention of escrow funds to the extent HoT was subject, as of May 15, 2012, to an existing (even if unresolved) claim by tax authorities of a pre-merger tax deficiency by Kaz.  Applied to HoT's 17 disputed claims, that standard justifies HoT's retention of escrow funds corresponding to some claims (including the IRS Claims and the Hong Kong Inland Revenue Claims).  But it requires the release to Kaz of funds which HoT has sought to retain based solely on inchoate claims that HoT unilaterally has imagined (including the Accrual Claims).

### a. The Court's Role in Construing the Agreements

In reaching this conclusion, the Court begins by noting that the construction of these agreements is an appropriate task for the Court at the summary judgment stage. "The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Ladenburg Thalmann & Co. Inc. v. Modern Cont'l Const. Holding Co., Inc.*, No. 04 Civ. 0974 (DAB), 2009 WL 855654, at *3 (S.D.N.Y. Mar. 23, 2009). "Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) (citing *Kass v. Kass*, 91 N.Y.2d 554 (1998)). "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *Collins v. Harrison–Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)).[6]

"If a contract is ambiguous, a court may resolve [the] ambiguity . . . as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." *Collins*, 303 F.3d at 433. "The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of

---

[6] New York law applies here, because the Merger Agreement and Escrow Agreements both contain a choice of law clause, stating that they should be "governed by, and construed in accordance with, the laws of the State of New York." MA § 12.8; *see also* EA § 8(c) (same). In New York, such forum selection clauses are "prima facie valid and enforceable unless shown by the resisting party to be unreasonable." *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 612 (S.D.N.Y. 2008) (quoting *Brooke Grp. v. JCH Syndicate 488*, 87 N.Y.2d 530, 534 (1996)). In their submissions and at argument, both parties have treated New York law as governing.

their agreement." *Compagnie Financiere*, 232 F.3d at 157.  Where, however, "there is 'conflicting extrinsic evidence with respect to the intent of the parties,' . . . summary judgment is inappropriate." *Fredericks v. Chemipal, Ltd.*, No. 06 Civ. 966, 2007 WL 1310160, at *5 (S.D.N.Y. May 3, 2007) (Lynch, J.) (citation omitted).

The agreements here are not pellucid as to the issue at hand.  As to the standards for *indemnification*, the Merger Agreement contains a lengthy definition:  It provides that the selling shareholders indemnify HoT "to the extent of any Loss resulting from" the breach of any tax warranty by Kaz.  MA § 10.2.  It defines "Losses" as "any and all losses, liabilities, damages, claims, awards, judgments, costs and expenses (including reasonable attorneys' fees) actually suffered or incurred" by HoT.  *Id.* § 12.5(ff).  But neither the Merger Agreement nor the Escrow Agreement contains a corresponding section that delineates the circumstances under which, after May 15, 2012, HoT may resist release of escrow funds.  Instead, the Escrow Agreement sets a May 15, 2012 deadline for HoT to give notice "of the Losses claimed by [HoT]," EA § 4(d)(iii), without specifying the factual predicate that must exist for such a claim of Loss by HoT to be justified.  This contractual lacuna has led to this expensive and hard-fought litigation.[7]  And the Court, in resolving this issue, has of necessity relied not on a plain statement within the

---

[7] At argument, both parties agreed that the issues of (1) whether funds must be released now from escrow, and (2) whether HoT will one day have a valid claim or claims for indemnification, are distinct, and that, even if Katzman prevailed in this lawsuit, HoT would remain at liberty later to seek indemnification.  Argument Transcript ("Tr.") 44.  The Court inquired, then, why the parties have so vigorously fought over what amounts to temporary possessory rights to money (the escrow funds).  Tr. 30–31, 39.  Counsel explained that, as a practical matter, it is easier for HoT to pursue a claim of indemnification in the future if the money it seeks is held in one place, in escrow.  That is because, under the Merger Agreement, to the extent HoT seeks money not held in escrow, HoT would have to sue Kaz's selling shareholders individually for their respective *pro rata* portions of any claimed tax deficiency, which could be cumbersome and expensive.  *See* Tr. 39–40; MA § 10.2(c) (selling shareholders are severally but not jointly liable for any loss resulting from the breach of representations); *id.* § 10.2(e)(iii) (liability of any individual selling shareholder is limited to the portion of consideration actually received by that shareholder in the merger).

15

agreements, but on reasonable inferences drawn from context and surrounding provisions, as explained below.

At argument, both parties acknowledged that the Merger Agreement is ambiguous.  Tr. 23, 37, 57.  Importantly, however, neither has argued that extrinsic evidence is relevant to resolving this ambiguity.  And both agreed that the issue of construction presented is for the Court.  Tr. 57–58.  *See Fredericks*, 2007 WL 1310160, at *6 (court construes meaning of ambiguous retainer agreement where "neither of the parties contend that there is any extrinsic evidence that might affect how the agreement should be interpreted"); *see also Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994) ("[A]mbiguity itself is not enough to preclude summary judgment."); *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d at 1183–84 ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on.").[8]

### b.  The Standard for Indemnification under the Merger Agreement

Turning to the merits, the Court considers, first, the scope of HoT's indemnity obligation, and turns then to the relationship between that obligation and the operation of the escrow fund.

Katzman claims that only out-of-pocket losses experienced by HoT are indemnifiable. That claim is unpersuasive, because it is irreconcilable with the text of the Merger Agreement. Section 10.2(a)(i) of that Agreement provides for indemnification to the extent of "any Loss" resulting from the breach of any of the selling shareholders' tax representations or warranties. The Merger Agreement then broadly defines "Losses" as "any and all losses, *liabilities,*

---

[8] Also justifying the Court's resolution of the contract's meaning, under the Escrow Agreement, Kaz and HoT have waived any right to a jury "with respect to any lawsuit or judicial proceeding arising [out of] or relating to this Agreement."  EA § 8(c).

damages, claims, awards, judgments, costs and expenses (including reasonable attorneys' fees)

actually suffered or incurred by such Person."  MA § 12.5(ff) (emphasis added).

      Under New York law, there are two types of indemnification agreements: those that

indemnify against *loss* and those that indemnify at an earlier stage, against *liability*.  *Madeira v.*

*Affordable Hous. Found., Inc.*, 323 F. App'x 89, 91 (2d Cir. 2009).  The Second Circuit has

explained:

> Under an agreement to indemnify against loss, a right to indemnification does not
> accrue until the indemnified party has satisfied the judgment, *i.e.*, suffered a loss.
> By contrast, a right to indemnification against liability arises when judgment is
> entered, even though the defendant has not paid the judgment and, thus, suffered
> no losses.

*Id.*  The Merger Agreement here clearly indemnifies against liability.  This is apparent from the

definition in § 12.5(ff), which explicitly so states.  Katzman's contrary notion would excise the

word "liability" from that definition.  It is thus irreconcilable with basic precepts of statutory

interpretation:  "New York law clearly 'disfavors interpretations that render contract provisions

meaningless or superfluous.'"  *Madeira*, 323 F. App'x at 91 (quoting *Manley v. AmBase Corp.*,

337 F.3d 237, 250 (2d Cir. 2003)); *see also Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,

309 F.3d 76, 86 (2d Cir. 2002) (collecting cases).

      Despite Katzman's urging, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 150

(S.D.N.Y. 2004), is not to the contrary.  There, Judge Kaplan recognized that, "[a]lthough loss

indemnification is more common, courts have construed an indemnification agreement to be one

against liability where there is some express indication that the parties so intended."  *Id.* at 151.

Judge Kaplan found that the indemnification agreement in that case applied to loss, not liability,

based on a provision that defined indemnifiable losses being net of insurance:  "The requirement

that the Losses be net of insurance, however, indicates that each party is required to actually

suffer a loss, obtain insurance reimbursement if applicable and only then seek indemnification

from the other party." *Id.* Here, by contrast, no provision of the Merger Agreement conflicts

with the plain language defining Losses to include liability indemnification. Quite the contrary,

§ 10.2(f)(i) provides that if HoT receives "an insurance or other recovery . . . with respect to any

Loss for which [HoT] has been indemnified hereunder in full, then a refund equal to the

aggregate amount of the recovery less expenses of securing such recovery shall be made to

[Katzman]." *Id.* That HoT may be indemnified *before* it has received reimbursement from an

insurance carrier reinforces that the agreement provides for liability indemnification.

       HoT's construction of the contractual standard for ultimate indemnification, however, is

equally unsustainable. HoT concurs in the Court's conclusion that the contract provides for

*liability* indemnification. But, presumably because none of its 17 contested claims have matured

so as to satisfy the definition in *Madeira* of an indemnification against liability—"a right [that]

arises when judgment is entered, even though the defendant has not paid the judgment and, thus,

suffered no losses"—HoT rejects the Second Circuit's definition. HoT instead contends that

"liabilities" under the Merger Agreement can consist solely of bookkeeping accruals that its

accountants unilaterally have made, pursuant to Generally Accepted Accounting Principles

("GAAP"), that would negatively affect HoT's financial position. Def. Br. 6, 8–13.

       That argument is unpersuasive. Nothing in the Merger Agreement supports HoT's

definition, or suggests that the parties had tacitly agreed upon a sweeping definition of liability

indemnification that would be alien to New York courts.[9] And, under New York law, an accrual

---

[9] At several points in the Merger Agreement, but not in the definition of "Losses," the upper-case word "Liabilities" is used—for example, to refer to liabilities of subsidiaries of Kaz that under the Merger Agreement are transferred to HoT. *See, e.g.*, MA §§ 4.12(n), 4.20, 7.1(b)(x), 9.2(n). The Merger Agreement defines upper-case "Liabilities" as "liabilities, debts or other obligations of any nature, whether known or unknown, absolute, accrued, contingent, liquidated,

cannot constitute a "liability" under an indemnification agreement.  Liability indemnification

instead requires *fixed* liability.  *See Pfizer*, 348 F. Supp. 2d at 150 ("To assert a claim under a

loss or liability indemnification agreement, a party must establish that the amount claimed is

fixed."); *see also Madeira*, 323 F. App'x at 91; *Hutton Constr. Co. v. Cnty. of Rockland*, 52 F.3d

1191, 1193 (2d Cir. 1995); *Goodridge v. Harvey Grp., Inc.*, 778 F. Supp. 115, 133 (S.D.N.Y.

1991).

HoT relies on one case in support of its claim that the GAAP definition of liability is

determinative here: *Alliance Industries, Inc. v. Longyear Holdings, Inc.*, 854 F. Supp.2d 321

(W.D.N.Y. 2012).  But *Alliance Industries* is far afield.  At issue there was whether the plaintiff,

in connection with a stock purchase agreement, was accurate when it represented that it had no

liabilities.  *Id.* at 325–26.  The agreement did not define the term "liabilities," and the parties

disputed whether a medical insurance claim by an employee's dependent was a liability that the

plaintiff had been required to disclose.  *Id.* at 327.  The district court held that the "liabilities"

required to be disclosed were liabilities as defined by GAAP, because "the contract is clear that

financial statements were to be prepared in accordance with [GAAP]."  *Id.* at 329.  Because the

plaintiff's financial statements deviated from GAAP in not disclosing the dependent's claim, the

court held that it had not properly disclosed this liability.  *Id*. at 330–31.

---

unliquidated or otherwise, and due or to become due or otherwise."  MA § 12.5(ee).  In its brief,
HoT argued that "liabilities" as used in the definition of Loss had the same definition as upper-
case "Liabilities."  Def. Br. 15–17.  However, that argument fails for two reasons.  First, the
parties' use of the defined upper-case version in certain portions of the agreement creates a
negative implication that references elsewhere to the lower-case version did not carry the same
meaning.  Second, the definition of "Liabilities" expressly incorporates lower-case "liabilities"
among its meanings.  This strongly implies that "Liabilities" is a broader (potentially far broader)
concept than "liabilities."  At argument, HoT conceded that "liabilities" does not equate to
"Liabilities."  Tr. 59.

The interpretation of "liabilities" in *Alliance Industries*, however, had nothing to do with indemnification for liabilities.  And, unlike in *Alliance Industries*, nothing in the Merger or Escrow Agreements in this case remotely suggests that the selling shareholders and HoT intended their liability indemnification provision to be measured according to GAAP.  On the contrary, the parties, absent a contractual definition of "liabilities," are presumed to have intended to use, as the background norm, the New York courts' definition of liabilities in the liability indemnification context.  *See 1765 First Assocs., LLC v. Cont'l Cas. Co.*, 817 F. Supp. 2d 374, 377 (S.D.N.Y. 2011) (considering contract's "plain language, applicable case law construing the identical terms, analogous precedents, and legal principles governing contract interpretation"); *Primax Recoveries Inc. v. Carey*, 247 F. Supp. 2d 337, 343 (S.D.N.Y. 2002) (interpreting contract in light of "background of common-sense understandings and legal principles that the parties may not have bothered to incorporate expressly but that operate as default rules to govern in the absence of a clear expression of the parties' intent that they do not govern" (citing *Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Wells*, 213 F.3d 398, 402 (7th Cir. 2000))).

For HoT to be entitled to indemnification by the selling shareholders, then, a determination of fixed liability, such as a judgment or its equivalent, is required.  *See Madeira*, 323 F. App'x at 91.  None of HoT's 17 disputed claims presently meets that standard.  None has progressed to the point of a judgment, or damage award, or, with the exception of HoT's AMT claim, anywhere close.[10]  The claims to have progressed farthest are HoT's IRS Claims and the Hong Kong Inland Revenue claims; as to these claims, tax authorities have asserted claims of pre-merger tax deficiencies by Kaz.  But no judgment has been rendered as to these claims, nor

---

[10] As discussed *infra*, HoT's AMT Claim indirectly derives from an administrative settlement between Kaz and the IRS.

has any final, fixed determination been made as to Kaz's tax shortfalls, if any.  These claims are in the process of administrative review, and are not yet even *sub judice*.  Therefore, if HoT, to block the disbursement of escrow funds to Katzman, were required to demonstrate that the standard for ultimate indemnification as to a claim had been met as of May 15, 2012, HoT would lose as to all 17 disputed claims.[11]  That premise, however, is incorrect.

### c.  The Standard for Retention of Escrow Funds

Although none of its claims have yet reached the stage where a determination of Kaz's tax liability has been fixed, HoT can nonetheless retain funds in the escrow account, because, the Court concludes, the standard for retention of escrow funds after May 15, 2012, is not the same as the standard for indemnification.  Both parties assumed that these standards were coextensive. However, read together, the Merger and Escrow Agreements are inconsistent with the notion that, unless Kaz's tax liability had been determined with finality as of May 15, 2012, all escrow funds were to be released to the selling shareholders.

Three provisions are particularly instructive on this point.  These are § 10.2(g) of the Merger Agreement, which specifies the notice that HoT must give Katzman of claims as to which it may later seek indemnification; § 10.7, which addresses the release of escrow funds; and §§ 4(d)(ii)–(iv) of the Escrow Agreement, which provide for the release of escrow funds on May 16, 2012, net of funds with respect to which HoT has made timely claims.

Section 10.2(g) states, in pertinent part:

[HoT] shall give [Katzman] written notice of any claim, assertion, event or proceeding as to which [HoT] may request indemnification hereunder as soon as practicable after the time that [HoT] first learns of such claim, assertion, event or proceeding.  Such notice shall state all the information then available regarding the amount and nature of such claim, assertion, event or proceeding and shall

---

[11] For this reason, Katzman took the position at argument that, even if the indemnity provision was for liability, not losses, it would still prevail on all 17 claims.

specify the representation, warranty, covenant or agreement in this Agreement under which the liability or obligation is asserted, and shall include copies of all correspondence received from any third party in connection with any such claim.

MA § 10.2(g).

Section 10.7, entitled "Release of the Indemnity Escrow Fund," states that:

Each of [Katzman] and [HoT] agree that on May 15, 2012 (the "Release Date"), it will instruct the Escrow Agent to release . . . the then existing Indemnity Escrow Fund less the aggregate amount of the Indemnity Escrow Fund that is subject to one or more claims by [HoT] made in accordance with the Escrow Agreement on or prior to [May 15, 2012]."

MA § 10.7 (emphasis in original).

Finally, § 4(d) of the Escrow Agreement provides that:

If HoT gives [Katzman] and the Escrow Agent a notice ("the Indemnity Demand Notice") pursuant to Section 10.2(g) of the Merger Agreement prior to 5 p.m. . . . on May 15, 2012 setting forth the aggregate amount (the "Indemnity Claim Amount") of the Losses claimed by [HoT] to the Escrow Agent, [31 days later] the Escrow Agent shall release and pay to [HoT] . . . from the Indemnity Escrow Fund the Indemnity Claim Amount set forth in such Indemnity Demand Notice, unless [within 30 days of the Indemnity Demand Notice], [Katzman] shall have given the Escrow Agent and [HoT] written notice (an "Indemnity Objection Notice") objecting to such release and payment to [HoT] of such Indemnity Claim Amount.

EA § 4(d)(iii) (emphases in original). Under the Escrow Agreement, to the extent the amount held in escrow exceeds the amount set out in HoT's indemnity demand notice, the parties agree to jointly instruct the escrow agent to release, on May 16, 2012, to the selling shareholders, the funds not subject to claims by HoT. *Id.* § 4(d)(ii). But the escrow agent is not to disburse "the aggregate amount of the Indemnity Escrow Fund that is subject to one or more claims made by [HoT] made in accordance with this Agreement." *Id.* And to the extent that Katzman has responded to HoT's notice with a timely notice of objection, the funds subject to the parties' competing notices may be released only upon a court order or joint instructions of the parties. *Id.* § 4(d)(iv) (citing *id.* § 4(a)–(b)).

Read together, these provisions contemplate that funds would remain in escrow after May 15, 2012, for the purpose of permitting those third-party claims of which HoT gave Katzman and the escrow agent timely notice to run their course. The Merger Agreement provides that, until May 15, 2012, HoT may give Katzman and the escrow agent notice of "claim[s], assertion[s], event[s] or proceeding[s]." MA § 10.2(g). Importantly, those terms—"claims," "assertions," "events," and "proceedings"—all describe inherently pre-judgment occurrences. HoT's notice as to them, to Katzman and the escrow agent, was, therefore, necessarily a placeholder. It served as notice that HoT might one day request indemnification as to these occurrences, not that these occurrences had necessarily progressed to the point of a judgment or other fixed determination of liability. The Merger Agreement's clarification that HoT's notice by May 15, 2012, is to be of "claim[s], assertion[s], event[s], or proceeding[s]" as to which HoT "*may* seek indemnification," *id*. (emphasis added), reinforces the point. It reveals the parties' expectation that HoT, after May 15, 2012, might request indemnification based on these occurrences. Such a request, presumably, would be made when and if the "claim, assertion, event, or proceeding" progressed to the point of an adverse judgment or other determination of fixed liability, *i.e.*, met the standard for indemnification.

It is also significant that, under § 10.2(g), HoT's notice must recite the information "*then available* regarding the amount and nature of such a claim, assertion, event or proceeding." *Id.* (emphasis added). That clause implies that additional information may become available later, *i.e.*, after May 15, 2012, with regard to such matters. That, in turn, is revealing as to the extent to which these matters must have progressed as of that date. It is easy to envision new relevant information becoming available as to inchoate or unresolved "claims," assertions," "events," or "proceedings." By their nature, such occurrences are fluid and evolving. It is harder to envision

relevant information becoming available as to a controversy that has already reached the point of judgment or other fixed determination of liability. This provision, therefore, confirms that the escrow fund was intended to remain in place after May 15, 2012, as to timely-noticed "claims," "assertions," "events," or "proceedings," to enable these to run their course.

To be sure, § 10.2(g)'s notice provision does not expressly refer to the escrow fund or the May 15, 2012 deadline. It instead directs HoT to give Katzman and the escrow agent prompt notice of circumstances that might ripen one day into indemnification claims. In theory, were § 10.2(g) read in isolation, the notice pursuant to it could be meant to refer to a separate required notice of potential indemnification claims, one unrelated to claims upon the escrow fund. But, importantly, § 4.3(d)(iii) of the Escrow Agreement expressly incorporates § 10.2(g)'s notice provision. Section 4.3(d)(iii) provides that, if HoT has given notice consistent with §10.2(g) before 5 p.m. on May 15, 2012, the escrow funds corresponding to the aggregate amount of that notice may not be released to the selling shareholders. From this, it follows that HoT's notice as of May 15, 2012, may be of a "claim," "assertion," "event," or "proceeding." It further follows that this notice is sufficient to require retention of escrow funds even if the occurrences that references are claims, assertions, events, or proceedings that have not yet matured to the point where they establish a right to indemnification (*i.e.*, a judgment or other fixed determination of liability).

Section 10.7 of the Merger Agreement reinforces this understanding. It provides for funds corresponding to HoT's aggregate claims upon the escrow fund to *remain* in the escrow fund after May 15, 2012, and not to be released to Katzman. That formulation would be logical if the purpose of the escrow fund, after May 15, 2012, were to set aside funds to be available to pay for timely-noticed, but as-yet unresolved claims, assertions, events, or proceedings, in the

24

event that they one day result in an adverse judgment or other fixed determination of liability.  It would be an awkward formulation to use, however, if the intention of the parties was that all escrow funds be released to Katzman after May 15, 2012, except where a judgment or fixed determination of Kaz's liability had been entered.

Indeed, had the parties intended that the standard for retention of escrow funds after May 15, 2012, be the standard for ultimate indemnification, there would have been little purpose for an escrow fund to survive much after that date.  Rather, to the extent that claims had reached the point of a fixed determination of liability so as to reflect a breach of a tax representation by Kaz, HoT would have been entitled to payment then and there from that fund; the remainder would have been required to be disbursed to Katzman.  Had the parties actually intended that outcome, it would have been easy for them to express it.  Nothing in the Merger and Escrow Agreements, however, is fairly read to contemplate the closure of the escrow fund promptly after May 15, 2012.

Finally instructive is § 10.2(h) of the Merger Agreement.  It authorizes HoT to use the escrow fund to defend against a third-party claim for which it seeks indemnification:  "[W]ith respect to any third party claim for which indemnification is sought under Section 10.2, [HoT] shall have the right to direct, through counsel selected by it and subject to the reasonable approval of [Katzman], the defense of any such Proceeding at the Common Equity Holders' expense, *such expense to be paid out of the Indemnity Escrow Fund*."  MA § 10.2(h) (emphasis added).  There is no time limit in § 10.2(h) after which escrow funds may no longer be used "to defend against a third party claim for which [HoT] seeks indemnification."  That provision would be rational, and would work a logical result, if the escrow fund was intended to remain in place to protect HoT's interests in connection with pending claims, assertions, events, or

proceedings of which HoT had given timely notice.  In effect, it enables the escrow funds to be

used after May 15, 2012, in the parties' common interest, to oppose third-party claims of tax

deficiencies.  But the provision would be of little use if, with third-party claims of Kaz's tax

deficiencies pending, the escrow fund were required after May 15, 2012, to be emptied

wholesale in favor of Katzman.  The parties certainly could have written a provision that cut off

HoT's right to use the escrow fund after May 15, 2012, to fund the defense of pending adverse

claims of tax deficiencies by third parties.  Section § 10.2(h), however, is a far cry from such a

provision.

      For these reasons, the Court holds that, to the extent HoT gave timely and proper notice

(*i.e.*, by 5 p.m. on May 15, 2012, and in accord with MA §10.2(g)) of a "claim, assertion, event,

or proceeding" involving a tax deficiency that, if established, would reflect a breach of a tax

representation by Kaz, the funds corresponding to that notice are to remain in escrow.[12]  Under

---

[12] In light of this escrow standard, the Court has no occasion to resolve an alternative argument
HoT made as to the selling shareholders' indemnification duty.  As an alternative to its argument
that the Merger Agreement adopts a GAAP-based standard for liability indemnification, HoT
argued that the Agreement entitles it to broad "claims indemnification."  HoT did not explain
how this concept would operate in practice; HoT appears to envision that, where a third-party tax
claim is made against HoT deriving from pre-merger conduct by Kaz, HoT is entitled to receive,
from the selling shareholders, money equal to the asserted value of that claim, even though the
claim is unresolved.  Def. Br. 22.  HoT based this theory exclusively on one word:  The Merger
Agreement defines "Losses" to include, alongside seven other nouns, "claims."  As a matter of
contract interpretation, HoT is correct that by including the word "claims," the parties would
ordinarily be presumed to have intended to add something to that definition.  *See Madeira*, 323 F.
App'x at 91.  However, the Agreement, which addresses indemnification at length, does not
contain any other provision that fairly implies that the parties intended thereby to put in place
such a sweeping and uncommon form of indemnification; and numerous aspects of the Merger
and Escrow Agreements are inconsistent with claim, as opposed to liability, indemnification.
More realistically, by including "claim," the parties may have intended to reinforce that "Losses"
comprehended indemnification for liability, not merely loss.  *See, e.g.*, *id.* (holding, on basis of
inclusion of "claim" within definition of "Loss," that indemnification was for liabilities).  But,
whatever the merits of this debate, the Court has no occasion to resolve it in this lawsuit, which
relates only to the fate of the escrow fund.  That is because the Court has interpreted the Merger
and Escrow Agreements to require that funds be retained in escrow to cover all third-party claims

26

§ 4(d)(iv) of the Escrow Agreement, such funds may be released only to the extent that the

parties give joint written instructions to the escrow agent, *see* EA § 4(a), or a court order or

judgment has resolved the claim in question, *id.* § 4(b).  *Cf. Thule AB v. Advanced Accessory*

*Holdings Corp.*, No. 09 Civ. 00091 (PKC), 2010 WL 1838894, at *7 (S.D.N.Y. May 4, 2010)

("In other words, eventual payment . . . was conditioned on subsequent events—agreements

between the parties or a judicial order—that confirmed the existence and quantum of loss.").

### 2.   Application to HoT's 17 Remaining Claims

The Court turns, next, to applying the above standard—for short, "the escrow

standard"—to HoT's 17 disputed claims.[13]

**The IRS Claims**:  The four IRS Claims satisfy the escrow standard.  Each represents,

literally, a claim and an assertion by the IRS of a pre-merger tax deficiency by Kaz.  Each claim

is reflected in a notice of proposed adjustment from the IRS.  As of May 15, 2012, each was

pending within the IRS, as a result of an appeal filed by HoT.  Pl. 56.1 ¶ 8; Def. 56.1 ¶ 8.  It is

undisputed that, if the tax deficiency cited in the NOPA is ultimately found with finality, that

deficiency will reflect a breach of a tax representation by Kaz.  Summary judgment for Katzman

---

which, if sustained in a judgment, would be indemnifiable.  Even accepting *arguendo* HoT's
improbable notion of claim indemnification, the Court would not read the word "claim" in the
definition of "Losses" to cover anything other than third-party claims.

In their briefs, the parties also spar over the meaning of other words and phrases within the
indemnification definition, including "breach" and "actually suffered or incurred."  In light of its
resolution of this dispute based on the separate standard for retention of escrow funds, the Court
has no occasion to address these issues.

[13] In opposing summary judgment, HoT suggested, for the first time, that it is also entitled to
have funds retained in escrow to compensate it for legal fees and costs incurred in defending its
Indemnity Demand Notice.  However, whether or not HoT has a viable claim to indemnification
of those expenses, they were not included in HoT's Indemnity Demand Notice.  HoT therefore
does not have the right to demand that funds be maintained in escrow to cover these expenses.

on the IRS Claims is, therefore, denied:  Funds corresponding to these four claims must remain in escrow.

        **The Hong Kong Inland Revenue Claim**: The Hong Kong Inland Revenue Claim also satisfies the escrow standard.  It, too, represents a claim and an assertion by a tax authority of a pre-merger tax deficiency by Kaz, pending as of May 15, 2012, which, if established, would reflect a breach of a tax representation by Kaz.  Pl. 56.1 ¶ 11; Def. 56.1 ¶ 11.  Summary judgment for Katzman on this claim is denied:  Funds corresponding to it must remain in escrow.

        **The Anticipated IRS Claims**:  These two claims involved adjustments that HoT, as of May 15, 2012, projected the IRS would eventually pursue, for the 2009 and 2010 tax years.  Each adjustment, if established, would reflect a tax deficiency that in turn represents a breach of a tax representation by Kaz.  As of May 15, 2012, however, the IRS had not made any claim, or surfaced in any way, as to these adjustments.  HoT's basis for projecting such adjustments is that the IRS (in the IRS Claims) made what HoT asserts are claims of parallel tax deficiencies as to the 2007 and 2008 tax years.  Pl. 56.1 ¶ 10; Def. 56.1 ¶ 10.

        HoT may prove correct in these projections.  But HoT's internal assessment does not meet the escrow standard.  In using the clause "claim, assertion, event or proceeding" in the Agreement, *see* MA § 10.2(g), the parties demonstrably contemplated claims, assertions, events, or circumstances *brought or initiated by a third party*.  To this end, § 10.2(g) directs HoT to give notice "as soon as practicable after the time that [HoT] *learns of* such claim, assertion, event or proceeding."  *Id.* (emphasis added).  That formulation naturally embraces claims or assertions by tax authorities.  But it is inconsistent with HoT, itself, having internally developed a theory of pre-merger tax deficiency by Kaz.  Similarly, the agreement directs HoT to "include copies of all correspondence received *from a third party* in connection with any such claim."  *Id.* (emphasis

added).  Simply put, nothing in the Merger or Escrow Agreements supports HoT's notion that retention of escrow funds after May 15, 2012, is justified based solely on future claims that it imagines tax authorities bringing.  Summary judgment on these two claims is merited for Katzman:  Funds corresponding to the Anticipated IRS Claims must be released from escrow to the selling shareholders.

**The Accrual Claims**:  These nine claims involve bookkeeping accruals by HoT.  All are based on conclusions by HoT's accountants that Kaz's pre-merger tax filings were deficient—in one case based on asserted failure by Kaz to file a tax return, in eight others based on asserted underreporting by Kaz of taxable income from foreign subsidiaries or affiliates.  Notice 2; Def. 56.1 ¶¶ 64–101.  HoT, however, does not allege that it has learned of these alleged deficiencies from any third party.  Nor does it allege that, as of May 15, 2012, any tax authority (or any other third party) had made any claim or assertion as to these matters.  It is instead undisputed that these deficiencies are ones conjured by HoT alone.[14]  For the same reasons as those discussed in connection with the Anticipated IRS Claims, summary judgment on these nine claims is merited for Katzman:  Funds corresponding to the nine Accrual Claims must also be released from escrow to the selling shareholders.

**The AMT Claim**: HoT represents that, as part of the acquisition, it acquired an asset consisting of an alternative minimum tax ("AMT") credit generated by Kaz in 2003.  However,

---

[14] Katzman notes that a public company such as HoT may have an incentive to record reserves in connection with accruals reflecting purported liabilities of an acquired entity.  Such reserves may later be reversed, increasing reported earnings.  Thus, Katzman argues, any accrual taken by HoT cannot automatically be taken as neutral assessment of Kaz's true pre-merger liabilities.  *Cf. First Nationwide Bank v. Gelt Funding*, 820 F. Supp. 89, 94–96 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 763 (2d Cir. 1994) (characterizing taking of reserves as "managerial guesswork").  Katzman's point is not without force.  However, because the text of the parties' agreements reveals that claims of tax deficiencies perceived by HoT alone as of May 15, 2012, do not justify retaining escrow funds, the Court does not rely on this point.

in 2012, the selling shareholders settled an existing dispute with the IRS, relating to a tax refund that the selling shareholders had retained during the acquisition.  Pl. 56.1 ¶¶ 14–15; Def. 56.1 ¶¶ 14–15.  The effect of this settlement, HoT contends, was to decrease Kaz's operating losses generated in 2006 and carried back to 2003, and thereby to decrease the corresponding AMT credit, owned by HoT as a result of the merger, by $228,943.  Def. 56.1 ¶¶ 14–16, 47–55; Kayman Decl. Ex. 3, at 16; Taylor Decl. Ex. 1, at 107–09.

The AMT Claim is idiosyncratic in this case:  It does not relate to a pending claim by a tax authority.  Nor does it relate to a claim hypothesized by HoT.  Rather, on the facts adduced by HoT at summary judgment, it relates to the impact upon HoT of an earlier settlement by the selling shareholders with the IRS.  These circumstances are not fairly characterized as a "claim" or an "assertion."  *See* MA § 10.2(g).  The selling shareholders' post-transaction settlement with the IRS, which HoT claims redounded to its detriment, is, however, fairly cast as an "event" and a "proceeding."  *Id.*  HoT further alleges that the effect of this event and proceeding, and the revision of Kaz's tax returns that it worked, was to reduce the value of an AMT credit it purchased from the selling shareholders.

HoT's assertion that funds corresponding to the AMT Claim must remain in escrow cannot be resolved on the present record.  First, although it is undisputed that the selling shareholders entered into a settlement agreement with the IRS, Pl. 56.1 ¶¶ 14–15; Def. 56.1 ¶¶ 14–15, there is an unresolved question of fact whether that settlement caused the value of HoT's AMT credit to decrease.[15]  Second, there is an unresolved question of fact whether the settlement by the selling shareholders, and/or the downward revision of the AMT credit, would

---

[15] Because Katzman provided only blanket objections to the relevance of many of HoT's 56.1 Statements, it is unclear whether Katzman disputes HoT's calculation of the decrease in value of the credit, and arguable whether Katzman has preserved the right to do so.  *See* S.D.N.Y. Local Rule 56.1(c)–(d).

bespeak a breach of a tax warranty made by the selling shareholders.  Third, it is unclear

whether—and if so, at what point—the events at issue have the potential to become a judgment

or other fixed determination of liability, as required for indemnification.  A unilateral settlement

by HoT alone of an IRS claim of a Kaz tax deficiency would not, under the Merger Agreement,

so qualify.  But a settlement by the selling shareholders themselves with the IRS, with

downstream adverse effects on HoT, may stand in a different position.  Given these open issues,

Katzman's motion for summary judgment as to the AMT Claim is denied, pending further

briefing.  For the time being, these funds must remain in escrow.

In sum, the Court holds that summary judgment is granted for Katzman as to Claims

Three and Four (the Anticipated IRS Claims) and Claims Eight and Eleven through Eighteen (the

Accrual Claims); and summary judgment is denied as to Claims One, Two, Five, and Six (the

IRS Claims), Claim Ten (the Hong Kong Inland Revenue Claim), and Claim Nine (the AMT

Claim).

III.    **Motion for Reconsideration of the Dismissal of HoT's Counterclaims**

A.    **Background**

On June 21, 2012, three weeks after the Complaint was filed, the Court held an extended

phone conference with the parties, prompted by Katzman's proposal to move for summary

judgment without the benefit of discovery.  The Court denied that request but agreed to set the

case on an accelerated schedule.  In addition, recognizing that the limited issue at hand involved

whether the standards for escrow retention had been met as of May 15, 2012, the Court directed

that discovery focus tightly on that issue.  It denied HoT's request for plenary discovery into

facts known to the selling shareholders that might be relevant to a future claim of a pre-merger

tax impropriety.  The Court emphasized to the parties that the case before it solely related to the

disposition of the escrow funds and that the Court did not intend to permit discovery to test whether, as of May 15, 2012, documents possessed or information known to the selling shareholders might conceivably support a future claim by a tax authority.

On July 25, 2012, HoT brought counterclaims for (1) indemnification under the Merger Agreement; and (2) a declaratory judgment to the same effect, with respect to all 18 claims listed in the Indemnity Demand Notice. *See* Dkt. 20.  On August 14, 2012, the Court received a letter from Katzman seeking permission to move to dismiss HoT's counterclaims; on August 20, 2012, HoT submitted a letter in response; on August 20, 2012, Katzman submitted a reply. *See* attachments to Dkt. 24.  The Court construed Katzman's letter as a motion to dismiss the counterclaims, and, on August 28, 2012, issued an Opinion and Order dismissing HoT's counterclaims, without prejudice.  Dkt. 24.  The Court explained that these counterclaims for indemnification were not yet ripe, and were not compulsory counterclaims within the meaning of Federal Rule of Civil Procedure 13.  The Court emphasized that the counterclaims would substantially expand the facts and legal questions at issue and ruling on as-yet unasserted claims would be necessarily speculative.

In moving for reconsideration, HoT argues that the Court was incorrect in its conclusion that HoT's counterclaims for indemnification were not yet ripe.  It further argued that its counterclaims are, in fact, compulsory under Rule 13.  Katzman responds that HoT is improperly making arguments not made in its initial letter; and, on the merits, that HoT's counterclaims are neither ripe nor compulsory.

**B.      Discussion**

**1.   Applicable Legal Standards**

The standard governing motions for reconsideration under S.D.N.Y. Local Civil Rule 6.3 "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  Such a motion is "neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have previously been made." *Associated Press v. U.S. Dep't of Defense*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005).  Generally, district courts will only amend or alter a judgment "to correct a clear error of law or prevent manifest injustice." *In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 120 (2d Cir.2010).

Here, however, the Court is mindful that there was not plenary briefing on Katzman's letter motion to dismiss HoT's counterclaims.  Instead, the parties set out their views in competing letters, and the Court, concluding that HoT's counterclaims were manifestly neither ripe nor compulsory, ruled on the basis of those submissions.  Under those circumstances, where HoT has not had the benefit of full briefing on this point, it is fair to consider arguments raised for the first time by HoT on its motion for reconsideration, and the Court will do so.  Nonetheless, on the merits, the Court finds neither an error of law nor manifest injustice in its decision to dismiss HoT's counterclaims without prejudice, and denies HoT's motion for reconsideration.

**2.   HoT's Counterclaims Are Not Compulsory**

Federal Rule of Civil Procedure 13(a)(1) provides:

33

> A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim:  (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

Rule 13(b), in turn, provides that "any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim" is a permissive counterclaim.

The test under Rule 13(a) for "determining a compulsory counterclaim is identical to the Rule 13(g) test for cross-claims."  *Federman v. Empire Fire and Mar. Ins. Co.*, 597 F.2d 798, 813 (2d Cir. 1979).  "To determine whether a cross-claim arises out of the same transaction or occurrence that is the subject matter of the original action . . . the court examines (1) the identity of facts between the initial claim and the cross-claim; (2) mutuality of proof; and (3) the logical relationship between the original claim and the cross-claim."  *Bank of Montreal v. Optionable, Inc.*, No. 09 Civ. 7557 (GBD), 2011 WL 4063324, at *3 (S.D.N.Y. Aug. 12, 2011) (citing *Federman*, 597 F.2d at 812).  "Although the 'logical relationship' test does not require 'an absolute identity of factual backgrounds,' the 'essential facts of the claims [must be] so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'"  *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004) (quoting *Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 699 (2d Cir. 2000)).

As the Court held in its earlier opinion, the Rule 13(a) test is not met here, nor is it even close to being met.  The issue presented by Katzman's lawsuit (whether HoT was justified under the Merger Agreement in insisting, after May 15, 2012, upon the retention in escrow of funds whose release Katzman seeks) is fundamentally distinct from, and far more limited than, those

presented by HoT's counterclaims (whether HoT will one day be shown to have a legal right to indemnification on each of its 18 claims). As the foregoing decision reflects, the issue here as to escrow is straightforward: Did HoT give timely notice of a "claim" or "assertion" of a tax deficiency that, if established to the point of fixing liability, would reflect a breach of a tax representation by Kaz? If so, funds corresponding to that notice must remain in escrow. In this inquiry, there is no occasion for the Court to address the merits of any such claim or assertion. The fact of a third-party claim of a pre-merger tax deficiency by Kaz, if timely noticed by HoT, suffices. By contrast, HoT's counterclaims would require the Court to litigate and fully resolve the merits of 18 separate claims as to indemnification.

There are numerous reasons why HoT's indemnification claims need not be resolved as part of the litigation over the retention of escrow funds.

First, injecting HoT's counterclaims into the current litigation would dramatically expand the scope of discovery, the cost to the parties, and the factual and legal issues to be resolved in this case. The litigation envisioned by HoT would entail 18 mini-trials into different alleged tax deficiencies. Such claims would presumably involve substantial expert, as well as lay, testimony. In all likelihood, these claims would also require extensive documentary discovery, including books and records, accounting information, and potentially electronic communications. No such materials have been needed for the Court to resolve the escrow issues presented here. And, as noted, the legal issues are distinct. Where Katzman's claims address the right to temporary possession of the escrow fund, HoT's counterclaims address the issue of ultimate entitlement to indemnification. The relationship between the escrow-fund and indemnification claims is sufficiently attenuated that the interests of economy do not require, and affirmatively disfavor, joining these claims.

Second, Katzman's claims are for a judge to decide, and HoT's (assuming no pretrial dismissal or grant of summary judgment) would be for a jury. The current lawsuit over retention of escrow funds arises, substantially, out of the Escrow Agreement. That agreement contains a broad waiver of a jury trial as to such claims. *See* EA § 8(c) (waiving jury trial "with respect to any lawsuit or judicial proceeding arising [out of] or relating to this Agreement"). HoT's claims as to ultimate indemnification, by contrast, arise out of the Merger Agreement. The Merger Agreement does not contain such a waiver, and HoT has demanded a jury trial on its counterclaims. Dkt. 22.

Third, it is premature, and unnecessary, for HoT's indemnification claims to be resolved here and now in litigation before this Court. HoT proposes that the jury in its indemnification case decide whether Kaz's pre-merger tax filings were, in the 18 particulars that HoT identifies, deficient, so as each to amount to a breach of a tax representation by the selling shareholders. But any such verdict would not bind the IRS or any of the relevant tax authorities. A jury could find that a particular tax return was defective, thus entitling HoT to indemnification, but the IRS might later find no such thing. Or, a jury could find no deficiency, thus defeating HoT's claim of indemnification, but the IRS might later disagree, forcing HoT to pay back taxes that it otherwise could have sought to recoup from the selling shareholders, via indemnification. There is also no assurance whatsoever that tax authorities will *ever* pursue the tax-deficiency claims that HoT imagines. That is particularly so as to HoT's nine Accrual Claims, as to which no tax authority has surfaced. In this respect, HoT's counterclaims are the paradigm of unnecessary adjudication.

For all these reasons, and those stated in its prior decision, the Court again finds that the *Federman* factors dictate that HoT's counterclaims are not compulsory within the meaning of Rule 13. *See Federman*, 597 F.2d at 812.

Finally, the Court notes again that the outcome of the present lawsuit over retention of escrow funds, and principles of *res judicata*, would not bar HoT from bringing a later suit for indemnification.  Whether retention of escrow funds beyond May 15, 2012, was justified under the parties' agreements is not "so logically connected" to the issues underlying the counterclaims as to demand their resolution in a common lawsuit.  At argument, counsel for both Katzman and HoT agreed, unequivocally, that the resolution of the pending escrow dispute does not resolve any substantive obligations as to indemnity.  Tr. 44.

The Court therefore denies HoT's motion to reconsider the dismissal of its counterclaims for indemnification.  The Court reaffirms the denial of those counterclaims, without prejudice to HoT's ability to bring such claims at a later time.

## CONCLUSION

For the foregoing reasons, partial summary judgment is entered for Katzman on each of Katzman's three causes of action.

1.  On the first cause of action, alleging breach of contract against Helen of Troy Texas Corp., summary judgment is entered for Katzman with respect to the following claims in HoT's Indemnity Demand Notice:  Claims Three, Four, Eight, and Eleven through Eighteen.  Damages equating to the aggregate values assigned to these 11 claims are to be paid to Katzman from the Indemnity Escrow Fund.  Summary judgment is denied with respect to the following claims in HoT's Indemnity Demand Notice:  Claims One, Two, Five, Six, Nine, and Ten.

2.  On the second cause of action, alleging breach of contract against Helen of Troy Limited, summary judgment is entered for Katzman for the same claims in HoT's Indemnity Demand Notice as on the first cause of action, and denied for the same claims as on the first cause of action.

3.  On the third cause of action, for a declaratory judgment, the Court declares that HoT is not entitled to withhold escrow funds in order to satisfy the liabilities claimed in Claims Three, Four, Eight, and Eleven through Eighteen in HoT's Indemnity Demand Notice.

For the foregoing reasons, HoT's motion for reconsideration of the dismissal of its counterclaims for indemnification is denied, without prejudice to HoT's right to bring such claims in the future.

The Clerk of Court is directed to terminate the motions pending at docket numbers 25 and 34.

There are a number of issues in this matter as to which the Court seeks guidance:

With respect to the seven claims by HoT on which the Court has not granted summary judgment in favor of Katzman, the Court invites the parties' views on (1) whether summary judgment in favor of HoT can be granted, or whether additional findings must be made before determining that funds corresponding to these claims must remain in escrow; (2) with respect to the New York State Claim, whether Katzman is conceding that $37,771.60 must be paid to HoT from the escrow fund, and if not, how the case should proceed as to that claim; and (3) with respect to the AMT Claim, how to proceed, in light of the open questions identified at pages 29–30, *supra*.

With respect to the 11 of HoT's claims on which summary judgment has been granted in favor of Katzman, the Court notes that, in his breach of contract causes of action, Katzman sought pre- and post-judgment interest and the costs of collection.  *See* Compl. ¶¶ 32, 37; *see also* N.Y. C.P.L.R. § 5001 (pre-judgment interest).  To the extent such relief is still pursued, the Court invites the parties' views as to whether Katzman is entitled to such relief, and if so, how it is to be measured.

Towards this end, the Court directs the parties to submit a joint letter, due by February 18, 2013, setting out the parties' respective views on these and any other open issues in the case, and a proposed expedited schedule, through and including trial, to address these issues.  Counsel are directed to meet and confer together about such issues, and about the prospect of settling the parties' broader dispute, no later than February 14, 2013.

A pretrial conference is scheduled for March 6, 2013, at 10:30 a.m.


SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 28, 2013
       New York, New York